UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X
:
Innovative Foodservice Group, Inc.,        :   Civil Action No. 1:23-cv-9536
:
Plaintiff,     :
:   **COMPLAINT**
-against-        :
:   JURY TRIAL DEMANDED
Liberty Mutual Insurance Company,          :
:
Defendant.     :
-----------------------------------------------------------------X

Plaintiff, Innovative Foodservice Group ("IFG"), by and through their attorneys, Reed Smith LLP, file its Complaint against Defendant Liberty Mutual Insurance Company ("Liberty Mutual"), and allege as follows:

## NATURE OF THE ACTION

1. Over one year has passed since Hurricane Ian made landfall in Fort Myers, Florida on September 28, 2022, yet Liberty Mutual has paid nothing to its insured, IFG, under the all-risks policy it issued. IFG has exhausted countless hours and considerable expense diligently making a claim under this policy and providing considerable supporting documentation from multiple third-party experts.

2. This is an action for breach of contract and breach of the covenant of good faith and fair dealing arising out of the refusal of defendant, Liberty Mutual, to provide full insurance coverage to IFG for the replacement of damaged equipment and supplies stored at an insured warehouse caused by Hurricane Ian and the resulting mold infestation of the warehouse and equipment and supplies.

3. Despite IFG complying with all conditions precedent required by the "all risks" Marine Cargo Policy (the "All-Risks Policy") Liberty Mutual sold to IFG, Liberty Mutual refuses to honor its contractual obligations to IFG for ever-shifting reasons. Notwithstanding that IFG has indisputably complied with the claim provisions of the All-Risks Policy and provided all requested information, Liberty Mutual has not paid any moneys to IFG even though it has acknowledged that some coverage is owed, but is only challenging the full extent of that damage. Such conduct violates New York's insurance regulations and has led to consequential damages that could have been avoided had Liberty Mutual performed its obligations under the All-Risks Policy.

4. IFG seeks direct and consequential damages for Liberty Mutual's breach of the All-Risks Policy and the covenant of good faith and fair dealing.

## THE PARTIES

5. Plaintiff IFG is a corporation organized and existing under the laws of the State of Florida, with its principal place of business located at 11101 N. 46th Street, Tampa, FL 33617. IFG is in the business of distributing foodservice kitchen equipment, supplies, and small wares to kitchens at restaurants, hospitals, assisted living facilities, schools, and more. The damaged products in question were to be used by these kitchens at the aforementioned customers.

6. Defendant Liberty Mutual Insurance Company is an insurance company organized and existing under the laws of Massachusetts with its principal place of business located at 175 Berkeley Street, Boston, MA 02116. Liberty Mutual is in the business of selling marine cargo policies and is a sophisticated market participant in both Florida and New York.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that Plaintiffs and Defendant are citizens of different States and the amount in controversy is in excess of $75,000.

8. Liberty Mutual is subject to personal jurisdiction because it is present and doing business within the State.

9. Section 69 of the All-Risks Policy, titled Choice of Law, also provides, in part:

> It is agreed that the rights and obligations of The Company and The Insured hereunder shall be governed by . . . the laws of the state of New York, irrespective of any principles of choice of law

10. Venue is proper by agreement of the parties pursuant to Section 68 of the All-Risks Policy, titled Venue, which provides, in part:

> It is hereby agreed that any legal suit, action or proceeding arising out of or in connection with this policy shall be instituted in the United States District Court located in the City County and State of New York[.]

## FACTUAL BACKGROUND

**A.     The Insurance Policy Sold by Liberty Mutual to IFG**

11. In exchange for the payment of valuable premium, Liberty Mutual sold to IFG Marine Cargo Policy No. NYOMC11328902 for a policy period incepting November 11, 2021 through November 11, 2023 (the "All-Risks Policy").

12. The All-Risks Policy's limits of liability for Warehouse Storage Coverage is set out in a Warehouse Location Schedule. For the warehouse located at 2560 Fowler Street, Fort Myers, FL 33901 (the "Warehouse"), the limit of liability is $1,000,000.

13. Section 14 refers to Point 8 of the Declarations, titled Valuation, which provides, in part:

3

> ***To be valued and insured for the selling price*** less all discounts and non-incurred expenses to which such goods and/or merchandise would have been subject had no losses occurred . . .

(emphasis added).

14. Section 3.1 and 3.2 of the All-Risks Policy, amended by the Warehouse Storage Coverage Endorsement, titled Perils, Terms of Average and Exclusions, provides that all "property owned by the Insured, and similar property of others for which the Insured is liable or is under obligation to insure, and for which the Insured may be liable in the event of loss while temporarily stored within the continental limits of the United States[,]" is covered:

> against ***all risks*** of physical loss or damage ***from any external cause irrespective of percentage,*** except the risks of war, strikes, riots and other causes excluded by the FC&S and SR&CC Warranties and by the Nuclear Exclusion Clause Paramount contained in this Policy.

(emphasis added).

15. Section 31 of the All-Risks Policy, titled Payment of Loss, provides:

> Loss, if any, to be paid within thirty (30) days of interest in the insured goods and loss thereto being established. Any amount of premium, if unpaid, shall be deducted first.

16. Section 34(a) of the All-Risks Policy, titled Machinery Clause, provides:

> When the property insured under this policy includes a machine consisting when complete for sale or use of several parts, then in case of loss or damage covered by this insurance to any part of such machine, The Company shall be liable for only the proportion of the insured value pertaining to the loss or damage, or ***at The Insured's option, for the cost and expense, including labor and forwarding charges, of replacing the lost or damaged part***.

(emphasis added).

17. Section 36 of the All-Risks Policy, titled Constructive Total Loss, provides:

> No recovery for a Constructive Total Loss shall be had hereunder ***unless the property insured is reasonabl[y] abandoned*** on account of its actual total loss appearing to be unavoidable, or ***because it cannot be preserved from actual total***

4

> ***loss without an expenditure that would exceed its value when the expenditure has been incurred***.

(emphasis added).

18. Section 36 of the All-Risks Policy, titled Suit Against the Company, provides:

> It is a condition of this policy that no suit, action or proceeding on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless The Insured shall have fully complied with all terms and conditions of this policy and unless commenced within twelve (12) months, next after the calendar date of the inception of physical loss or damage out of which the said claim arose, provided that where such limitation of time is held unenforceable by the court wherein such action has been commenced, then no suit shall be sustainable unless commenced within the shortest limitation of time enforceable in such court.

**B.     The Insured's Claim for Constructive Total Loss Caused by Hurricane Ian**

19. On or around September 28, 2022, Hurricane Ian, one of the most impactful storms in U.S. history, made landfall in the Fort Myers, FL area as a Category 4 hurricane.

20. IFG's Warehouse, an insured location under the Policy, located in Fort Myers, FL (the center of the hurricane's most impactful area) contained various equipment and supplies—refrigerators, freezers, stoves, sinks, serving tables, and more—that are sold by IFG to restaurants, hospitals, assisted living facilities, schools, and more (the "Insured Goods").

21. Mold Experts of Southwest Florida ("Mold Experts"), experts IFG retained to assess the damage caused by Hurricane Ian, concluded that the Insured Goods are damaged by the hurricane and contaminated with mold to such an extent that IFG is entitled to full replacement of the Insured Goods (the "Loss").

22. IFG also retained Berkeley Research Group ("BRG") as forensic accountants to quantify the damage to its equipment and supplies. BRG determined that the value of the Insured Goods at selling price, less costs not incurred, is above the $1,000,000 policy limits.

23. IFG, through its broker at the time, Brown and Brown, gave timely notice of the Loss to Liberty Mutual (the "Claim").

24. Relying on Mold Experts and BRG, IFG requested from Liberty Mutual a $1,000,000 payment representing the available limit of coverage under the All Risks Policy.

### C. Liberty Mutual Requests More Information

25. Liberty Mutual's adjuster, Laurent Coussa, rejected IFG's request for a $1,000,000 payment under the Policy.

26. By letter dated January 9, 2023, Liberty Mutual memorialized Mr. Coussa's rationale for rejecting IFG's request and advised IFG that it "reserves its rights under the [All-Risks] Policy and its issuance of any indemnity payment must await IFG's substantiation of physical damage to its goods and valuation of same."

### D. IFG Coordinates Inspections and Testing with Liberty Mutual

27. To further substantiate the Loss, IFG coordinated further inspections and testing with Liberty Mutual on March 22 and 23, 2023.

### E. Liberty Mutual's Olmsted Report and Coverage Position

28. Following the inspections and testing, Olmsted Environmental Services, Inc. ("Olmsted") prepared a report for Liberty Mutual on April 25, 2023, which became Liberty Mutual's basis for denying the majority of IFG's Claim (the "Olmsted Report").

29. On April 27, 2023, Liberty Mutual, relying on the Olmsted Report, refused to replace any of the Insured Goods as IFG requested.

30. Instead, Liberty Mutual made the erroneous claim that there was little to no damage to the equipment caused by the full-on impact of a Category 4 hurricane, and insisted that the Insured Goods be cleaned and/or repackaged.

### F. IFG Explains the Commercial Reality of Hurricane Ian's Impact to Liberty Mutual

31. On May 12, 2023, IFG requested that Liberty Mutual reconsider its position based on the Olmsted Report and pay the $1,000,000 as required by Clauses 34 and 36 of the All-Risks Policy.

32. In the letter, IFG first noted that Liberty Mutual misrepresented Clause 34 in its April 27, 2023 correspondence when it did not advise IFG that it had a contractual option to hold Liberty Mutual liable for replacing the "lost or damaged part" of the machine. IFG then provided formal notice that it is exercising that contractual option, when read with Clause 36, provides for recovery of a "Constructive Total Loss."

33. IFG also noted that Liberty Mutual's Olmsted Report demonstrates that there is no dispute that IFG's Insured Goods (or the crating or packaging of the Insured Goods) showed signs of mold growth caused by the water from Hurricane Ian.

34. IFG explained it would be unduly burdensome and unreasonable for IFG to clean the mold growth as Liberty Mutual proposes:

> IFG has already explained this to Liberty Mutual on several occasions, but a representative of National Organization of Remediators and Mold Inspectors ("NORMI") indicated that, if cleaning were to be attempted, all inventory would need to be moved into a "cleanroom." A technician for each equipment manufacturer would need to be present to disassemble the equipment so that a specialist could clean the electronics and mechanical pieces thoroughly. A third-party testing company would then need to inspect each piece of equipment to confirm that the mold was removed and other water damage, such as rust, was remedied. The equipment would then need to be moved to the next phase if the cleanroom, where it could be reassembled.

35. IFG also explained to Liberty Mutual why replacing the Insured Goods is the only viable option:

> [T]he damaged equipment and supplies cannot be sold, either as new or at all. Cleaning is not the solution; it would be unethical and likely actionable for any

7

retailer to sell [the Insured Goods] to a consumer without disclosing the circumstances of damage suffered by the product. ***Such a process would plainly be more expensive than simpl[e] replacement of the [Insured Goods]***, and even if this more expensive route were chosen, IFG would likely need to disclose the hurricane and mold damage to any buyer to avoid any potential liability resulting form a failure to disclose the damage to the [Insured Good]. . .

Needless to say, [the "cleaning, . . . re-crating or re-packaging [of] the [I]nsured [G]oods" proposed by Liberty Mutual] is unduly burdensome, unreasonable, and simply not a viable option for IFG to take.

(emphasis added).

36. IFG then reiterated why its Loss cannot be avoided:

[A]ny form of dismantling and cleaning the equipment would void the legislative safety approvals of the equipment (UL, ETL, and AGA) along with NSF standards.

37. As a result, IFG has suffered a Constructive Total Loss caused by Hurricane Ian because any outcome other than Liberty Mutual's replacement of the Insured Goods would require a protocol that would either exceed the costs to replace the Insured Goods or leave IFG with Insured Goods that it cannot sell because they lack the requisite legislative safety approvals and warranties normally attached to equipment of this type.

38. To put it simply, IFG has demonstrated that its business and its customer base cannot be involved with transactions that involve the sale of goods directly and undeniably impacted by a category 4 hurricane where mold infestation has rendered that equipment damaged, and raised safety concerns that would ultimately void any warranties and protections the equipment would have, but for the remediation and testing required to remedy the damage.

**G.  IFG's Best Efforts to Avoid Litigation and Liberty Mutual's Refusal to Reconsider**

39. On May 31, 2023, again ignoring the commercial reality of the impact of Hurricane Ian and the accompanying mold infestation of the Warehouse, Olmsted, on behalf of

Liberty Mutual, prepared a supplementary report rejecting IFG's assertion that the cleaning, re-crating, or re-packaging of the Insured Goods is unduly burdensome, unreasonable, and not a viable option for IFG to take.

40. To encourage Liberty Mutual to pay IFG what is owed under the All-Risks Policy, IFG gathered additional supporting documentation and provided it to Liberty Mutual on August 24, 2023. The supporting documentation included an estimate and back-up materials showing that it would cost $828,978.29 just for equipment rentals, travel costs, logistics and labor to go through the cleaning process in accordance with Mold Experts' protocol.

41. In response, Liberty Mutual did not make any payment. On August 29, 2023, Liberty Mutual sent "comments" from its consultant, Olmsted Environmental Services, Inc. that rejects Mold Experts' protocol. Liberty Mutual also requested "a copy of any protocol or written work procedure and scope of work for review and comments."

42. Yet again, IFG gathered the requested materials and provided them to Liberty Mutual on September 26, 2023.

43. Despite continued efforts from IFG to avoid litigation, including providing Liberty Mutual with several third-party rebuttal reports, a costs estimate based on the hourly rates, cost of equipment, land, travel, and other logistics to complete the cleaning process, written protocol, and other additional information, Liberty Mutual never reconsidered its position and still has not paid IFG for any damage even though it acknowledges some undefined amount exists.

      **H.**    **Liberty Mutual's Failure and Refusal to Pay IFG for their Loss Has Caused IFG to Suffer Consequential Damages.**

44. IFG has complied, or at minimum, substantially complied, with all conditions precedent to coverage under the All-Risks Policy.

45. Liberty Mutual breached the All-Risks Policy by refusing to pay any coverage under the All-Risks Policy.

46. IFG has suffered damages as a consequence of Liberty Mutual's breach of its policy.

47. Liberty Mutual's failure and refusal to provide coverage for IFG's Loss has caused IFG significant damages. Specifically, IFG has expended storage costs for the Insured Goods that should have been replaced months ago in an effort to avoid being accused of spoliation. IFG has also lost the use of the money for other business purposes along with the ability to complete sales for which it purchased the Insured Goods in the first place. Further, through multiple rounds of information requests that it has itself deemed worthless, Liberty Mutual has distracted substantial time and effort of the IFG staff from undertaking their principal function of selling kitchen equipment, all of which was foreseeably avoidable if Liberty Mutual had performed its obligations to IFG. In addition, IFG has suffered consequential damages in the form of attorney's fees and associated costs as a result of being forced to initiate the instant insurance coverage action to recover amounts wrongfully withheld under the All-Risks Policy.

48. When the All-Risks Policy was sold, Liberty Mutual and IFG understood that, if Liberty Mutual breached the Policies, IFG could suffer damages of the type detailed above. Thus, such costs incurred by IFG were a direct and foreseeable consequence of Liberty Mutual's wrongful conduct in denying coverage for the Loss.

49. It would be reasonable for IFG to assume that Liberty Mutual would meet its contractual obligations and refrain from handling IFG's Claim for coverage in such a way as to exacerbate IFG's misfortune following the Loss. The very purpose of insurance coverage as afforded under the All-Risks Policy would make Liberty Mutual aware that if it breached the

All-Risks Policy, it would be liable to IFG for the costs of bringing a coverage action to recover amounts due under the All-Risks Policy.

50. Consequential damages are necessary to place IFG in the position it would have been in if not for Liberty Mutual's breaches.

## COUNT I – BREACH OF CONTRACT

51. IFG incorporates by reference the allegations contained in all of the foregoing paragraphs.

52. Liberty Mutual has failed and refused fully to perform its contractual obligations to provide coverage for IFG's Loss.

53. By virtue of its failures and refusals, Liberty Mutual is in breach of the All-Risks Policy.

54. As a result of these breaches, IFG has been denied the benefits of insurance coverage for which Liberty Mutual collected substantial premiums, and has incurred direct damages exceeding $1 million. Liberty Mutual is liable to IFG for all such damages in an amount to be proven at trial, plus prejudgment interest.

**WHEREFORE**, IFG respectfully requests the entry of an award requiring Liberty Mutual to pay IFG all monetary damages suffered by IFG caused by Liberty Mutual's breach, including, without limitation, compensatory damages, consequential damages, prejudgment interest, and post-judgment interest.

## COUNT II – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

55. IFG incorporates by reference the allegations contained in all of the foregoing paragraphs.

56. Liberty Mutual owes IFG a contractual duty of good faith and fair dealing to act fairly and reasonably in the investigation, processing and handling of claims for payment under the All-Risks Policy.

57. Liberty Mutual has refused to honor its contractual obligations under the All-Risks Policy to provide coverage for IFG's Loss.

58. Liberty Mutual has breached its duty of good faith and fair dealing by: (1) failing to conduct an honest, thorough, or timely investigation concerning the cause of the Loss; (2) failing to adequately or accurately inform IFG concerning the terms and conditions of the coverage afforded under the All-Risks Policy for the Loss; (3) placing its own self-interest above that of its Policyholder, including but not limited to ignoring and refusing to acknowledge the commercial realities of IFG's business, the type of equipment it sells, and the fact that no customer of IFG would agree to accept equipment and machinery that has been present in a mold infested warehouse when it had contracted to purchase new equipment that meant all governing regulatory and safety standards; and (4) compelling IFG to institute suit to recover amounts due under the All-Risks Policy.

59. As a result of Liberty Mutual's failures to act in good faith with respect to IFG's claim for payment under the All-Risks Policy, IFG has incurred damages, including consequential damages, such as the storage costs incurred to avoid being accused of spoliation, the lost sales, and the attorneys' fees and associated costs in pursuit of its claims.

60. Where an insurance company forces a policyholder out of the claims process and into litigation, the most foreseeable and reasonable measure of direct pecuniary loss by the All-Risks Policyholder is attorneys' fees and costs. Here, despite IFG's best efforts to avoid

litigation, Liberty Mutual forced IFG out of the claim process and into litigation to recover amounts due under the All-Risks Policy.

**WHEREFORE**, IFG respectfully requests the entry of an award requiring Liberty Mutual to pay IFG all monetary damages suffered by IFG caused by Liberty Mutual's breach, including, without limitation, compensatory damages, consequential damages, prejudgment interest, and post-judgment interest.

Dated: October 31, 2023

REED SMITH LLP

/s/ John N. Ellison

John N. Ellison
599 Lexington Avenue
New York, NY 10022
T: 212-521-5400
F: 212-521-5450
jellison@reedsmith.com

Attorneys for Plaintiff,
*Innovative Foodservice Group, Inc.*